BOGOVICH, ET AL., APPELLANTS, *v.* CHICAGO, M., ST. P. &
P. R. Co., ET AL., RESPONDENTS.

No. 8816
Submitted January 11, 1949. Decided March 8, 1949.
203 Pac. (2d) 971

Mr. W. B. Leavitt of Miles City, and Mr. F. F. Haynes, of Forsyth, for appellant. Mr. Haynes argued the cause orally.

Messrs. Murphy, Garlington & Pauly, of Missoula, and T. W. Carolan, of Forsyth, for respondent. Mr. Garlington argued the cause orally.

MR. JUSTICE FREEBOURN:

Plaintiffs, brother and sister, brought this action for loss of contributions from their father, James Bogovich, who was killed by defendants' train.

The cause is here on appeal for a second time. The first appeal taken by plaintiffs after verdict for defendants, resulted in reversal and new trial. Bogovich v. Scandrett, 117 Mont. 341, 158 Pac. (2d) 637. The second trial resulted in a verdict for defendants.

Briefly stated the facts are: James Bogovich was killed about ten o'clock a. m. on September 24, 1942, by a freight train of defendants, on a highway crossing at Ingomar, Rosebud county, Montana, while driving a two-horse team pulling a sheep wagon.

The highway extended north and south. It crossed three train tracks, running east and west, parallel to each other. They were designated the north, or house track; middle or passing track; and south or main line track.

The collision occurred on the main line track, on which the train approached the crossing from the west, traveling east.

The deceased had filled a water keg from a railroad water tank car, standing on the north track about fifty feet west of the crossing. Stowing the keg in place, he got into the wagon and drove his team, with saddle horse tied to them, to the north end of the planked highway crossing. Without stopping, he con-

tined over the crossing, moving south. He passed over the north track and the middle track in safety. The horses had passed over and the wagon was on the south or main line track when struck by the locomotive. The horses, loosened, ran away. The wagon was demolished and the driver killed.

Obstructing the view from the north end of the crossing to the west on the north track were four railroad cars, one being the water tank car, which was nearest the crossing.

There were four railroad cars on the middle track, all farther west than those on the north track, the nearest being about one hundred and thirty feet from the crossing. The distances between the track rails were four feet, eight and one-half inches. The distance between the north track and middle track was eleven feet, eight inches, with the same distance between the middle and main tracks.

The evidence at both trials was substantially the same.

The issues of negligence and contributory negligence were properly submitted to the jury.

Appellants' request for reversal and new trial is based chiefly on the lower court's refusal to give appellants' instruction No. 16, called the peril or emergency instruction; also on the refusal to give appellants' instruction No. 13, and the giving of the court's instructions 18 and 19, over appellants' objections.

Instruction No. 16 is as follows: ''You are instructed that if you believe from a preponderance of the evidence in this case that James Bogovich without any fault of his own, was confronted with a sudden emergency and immediately before the time he was struck by the locomotive, he was not required to exercise that degree of care which is necessary when there is time for deliberation, he was required to act only as a reasonably prudent man would act under the same or similar circumstances.''

Mrs. Blanche Brown, plaintiff's witness, was the only witness who saw the wagon and team continuously from the time deceased put the keg of water in the wagon until the collision occurred on the main line track. She was about two hundred

feet from the south of the railroad crossing. Her view of the crossing and water tank car was unobstructed.

Her testimony was substantially, and where set out in quotation marks exactly, as follows:

She was moving from the south toward the crossing. "Well, I saw the sheep wagon up there. It looked to be right at the end of the water car." The wagon was at the east end of the car. "I notice him with a barrel or keg of some kind." "He put it in the back end of the sheep wagon like they do and I think it must have been about that time I heard the train coming." The horses, while standing, were facing southeast. After placing the keg in the rear box of the wagon the man got into the wagon. He drove down to the highway crossing and then turned and crossed or started to cross. He did not stop as he crossed over the tracks. He kept right on going through. The next thing he had been struck. The train just missed the horses. The three horses got loose and came down the street. She saw the train before the impact. When the horses were crossing the tracks they were going at "just about medium gait." They were not running or galloping. "No, they were not hurrying, just like anybody would ride along the road."

At the time the wagon started over the crossing the door and the front end, where the door was, were visible to her. The wagon was approaching her. She did not recall the door being opened or closed. She could not remember whether the deceased was standing in the doorway driving the team. The team appeared to be under control. They proceeded across the tracks without changing their pace. Her attention was centered on the sheep wagon from the time it started toward the crossing.

Plaintiffs' witness Jensen substantially testified that the deceased worked under his direction, tending camp and moving sheep wagons around; that at the time of his death he was driving one of Jensen's wagons on the trail to Meyers. It was an ordinary canvas covered wagon, about twelve feet long and six feet, eight inches wide, with two-foot jockey box behind. The wagon tongue extended an additional eight feet. It had a front

door; the top half of which could be opened or closed without regard to the bottom half. The wagon had no flaps on the side or on the front which could be lifted or rolled up. The canvas was fastened with tacks.

A person driving the wagon could sit or stand. "They generally sit on the stove." The stove was right inside the door. The driver, if he preferred, could stand in front of the door. The witness was familiar with the horses. "They were gentle work horses." The deceased had driven these horses for some time. He was a good, careful driver. He took good care of the horses. Such a team made a speed proceeding at a walk of "about three and a half to four miles an hour." The ordinary rate of speed was a walk. "They can make better speed, but that is the usual rate of speed."

A gentle team such as these could be stopped almost immediately by the driver. Such a team would not require more than one step in which to stop. A walking team can ordinarily be stopped in a distance of three or four feet.

To make instruction 16 applicable the evidence would have to disclose, "that James Bogovich, without any fault of his own, was confronted with a sudden emergency and immediately before the time he was struck by the locomotive."

Webster's New International Dictionary defines "emergency" to be: "An unforeseen combination of circumstances which calls for immediate action; * * *" As relating to the law of negligence, it may properly be defined "as any event or combination of circumstances which call for immediate action without giving time for the deliberate exercise of judgment or discretion, in short, an emergency." Vol. 14, Words and Phrases, Perm. Ed., page 300, citing Mayott v. Norcross Bros., 24 R. I. 187, 52 A. 894.

"The rule as stated in the authorities generally is that: 'One who, in a sudden emergency, acts according to his best judgment, or who, because of want of time in which to form a judgment, omits to act in the most judicious manner, is not chargeable with negligence. Such * * * act or omission * * *

may be called a mistake, but not carelessness'. Floyd v. Philadelphia & Reading R. Co., 162 Pa. 29, 29 A. 396; citing cases.'' Peabody v. Northern Pac. Ry. Co., 80 Mont. 492, 261 Pac. 261, 262.

What evidence is there to warrant the conclusion that the deceased ever saw the approaching train, or appreciated his danger and acted? What evidence is there that he acted in an emergency?

He did not whip up his horses, pull them to a stop, jump from the wagon, or do anything from which the jury could find he acted or attempted to act after knowing the train was approaching.

If we do not consider the testimony of defendants' witness, Pickett, that he warned deceased of the approach of the train before he put the water keg in the wagon, there is no evidence showing the deceased knew of the approaching train or appreciated any danger either before or while he was on the crossing.

He may have been sitting on the camp stove entirely within the covered wagon, oblivious to all danger, while on the crossing. Instructions where not warranted by the facts should not be given. Fitzgerald v. Clark, 17 Mont. 100, 42 Pac. 273, 30 L. R. A. 803, 52 Am. St. Rep. 665.

Also, the instruction was largely an abstract statement of law and would have left the jury to guess and speculate as to what the ''emergency'' was.

The court did, however, instruct the jury on this phase of the case, by giving instruction No. 13 as follows: ''You are instructed that while it was the duty of the decedent, James Bogovich, as he was approaching the railway crossing of the defendant, to take all reasonable precautions to assure himself by actual observation that there was no danger from an approaching train, nevertheless, if you find from the evidence that in so approaching such railway crossing he took such precautions and thereupon entered upon such crossing, and having so entered was suddenly confronted with the oncoming train operated by defendants, then and in that event there was no duty on the part of said

decedent to stop his team and wagon unless you find from the evidence that said decedent was then in a place of safety. If, at said time, he was not in a place of safety from the oncoming train, he was only required to do what was reasonable under the existing circumstances to escape injury.''

Appellants suffered no harm from the refusal to give their ██ instruction No. 16.

It was not error to refuse appellants' requested instruction No. 13. There was no evidence to which part of it could apply. Relevant parts were embodied in other instructions. The wording of part, viz: ''He was under no obligation to stop after entering the right of way at said crossing,'' could only confuse the jury as to the meaning intended. The court may refuse an instruction good in part and bad in part. Ford v. Drake, 46 Mont. 314, 127 Pac. 1019.

The court did not err in giving instructions 18 and 19. These ██ instructions considered with all the others as a whole fairly state the law. Instructions must be considered as a whole. Mulligan v. Montana Union Ry. Co., 19 Mont. 135, 47 Pac. 795.

In passing, it may be well to say that such phrases as, ''the ██ rule * * * has been thorough established,'' etc., had best be omitted from instructions to a jury. They can only serve to overemphasize the particular instruction in which contained.

No prejudicial error being shown the judgment is affirmed.

Mr. Chief Justice Adair and Associate Justices Angstman, Metcalf and Bottomly concur.