## No. 12,818.

COLORADO AND SOUTHERN RAILWAY COMPANY *v.* HONAKER.

(19 P. [2d] 759)

Decided February 6, 1933.   Rehearing denied March 13, 1933.

Messrs. Lee, Shaw & Bryans, Mr. J. L. Rice, Mr. J. Q. Dier, Mr. Andrew C. Scott, for plaintiff in error.

Messrs. Stow & Stover, Mr. Herbert A. Alpert, for defendant in error.

*In Department.*

Mr. Justice Butler delivered the opinion of the court.

In a personal injury action against the Colorado and Southern Railway Company, Myrll Honaker obtained a judgment for $2,869. The railway company seeks a reversal of that judgment.

Mason street runs north and south in Fort Collins, a city whose population in 1930 was over 11,400. Laurel street runs east and west and crosses Mason street. South of Laurel street Mason street is 40 feet wide from curb to curb; north of Laurel street it is 68 feet wide from curb to curb. Laurel street is 60 feet wide from curb to curb. The track of the railway company is on Mason street. South of Laurel street the west rail is less than 15 feet from the west curb; north of Laurel street it is 40 feet from the west curb. About 20 feet west of the west rail and about the center of Laurel street, projected, is a cement warning signal post, on top of which is a sign, "R. R." Fronting Laurel street and about 40 feet south of the curb is a building on the Agricultural College grounds. The building is about 95 feet long, extending east and west, and reaches to within 20 feet of the west curb on Mason street. There are several trees in the parking on Laurel street opposite the college building and several others on Mason street opposite the east end of the college building. At the time of the accident the trees, which were not in full leaf, were but a

slight, if any, obstruction to the view of the railroad track to the south of Laurel street. Four hundred feet south of the center of Laurel street is College depot. For the protection of the public, the city enacted an ordinance limiting the speed of trains within the city to 15 miles an hour.

The following statement of facts is based, as it should be, upon the evidence most favorable to Honaker. On May 13, 1930, at about five minutes of 6 o'clock in the afternoon, Honaker, a student at the Agricultural College, left a house, referred to as 612 South Howes street, in his automobile. That street is parallel with and one block west of Mason street, and the house is two-thirds of a block north of Laurel street. Honaker was bound for his boarding-house, between 5 and 6 blocks away. He had 20 minutes in which to get there in time for dinner, which was to be at quarter past 6 o'clock. He turned on Laurel street at a slow rate of speed because of the roughness of the road there. At the middle of the block between South Howes street and Mason street he was going 20 miles an hour. He was thoroughly familiar with the crossing and the surroundings. He had passed over the crossing probably every school day in his junior and sophomore years. He knew that the customary speed of the trains was 20 miles an hour, and that it was the custom for the train to reach that crossing at 5:30 or 5:40 p. m. It was customary for the train whistle to be blown and the bell to be rung as the train approached the crossing, and when those signals were given Honaker would close the throttle of his automobile about 100 feet from the crossing and would come to a "dead stop" between 20 and 30 feet from the crossing. On the occasion in question no warning signal was given. The evidence on this point was conflicting, and the verdict of the jury conclusively determines that conflict in favor of Honaker's contention. When about 55 or 60 feet from the railroad track, Honaker slowed down and listened, but there was no warning signal. The automobile was only a

few feet to the south (the driver's right) of the center of Laurel street. At that moment he saw the train "coming out past the corner of" the Agricultural College building. The train then was about 80 feet south of the south side of Laurel street. There were two cars, the front one being a motor car. The train was coming at a speed of 35 miles an hour. The engineer testified that the train was about 25 minutes late. Honaker was obliged to decide instantly what to do. Not being sure that he would be able to stop his car before reaching the track, and knowing that he could not cross in front of the train, going, as it was, at such an unusual and excessive rate of speed, he concluded that the best thing to do was to turn and "go with the train rather than take the chance of sliding into it." He applied the brakes, skidded 5 or 10 feet, and then turned to the left to go north on Mason street parallel with the train. The space between the south curb on Mason street and the west rail of the track, as we have seen, was 40 feet, which is equal to the entire width of that street south of Laurel street. The turn could have been made successfully but for the presence of the warning signal post and the excitement under which Honaker labored at the time. The front part of the automobile, headed north, passed west of the post, but the rear wheels skidded to the east, bringing the rear of the car into contact with the post, causing the automobile to swing around toward the train. The automobile came to a stop close to the track. When Honaker saw the train "just barely skimming past" the automobile, he started to get out, but "the train hooked on to the car and yanked it back around," and Honaker was thrown through the automobile door and under the rear of the train. The wheels severed his right leg half way between the knee and the foot. The street there had a hard, fine gravel surface. It was dry. Honaker's automobile was an open Ford touring car, with a top but no side curtains or wind wings. He had it overhauled and a new brake lining put on in April, 1930, and the brakes were in good

condition on the day of the accident. He was an experienced driver, having driven automobiles for about 5 years. There was a conductor on the train, but he was not called as a witness.

The warning signal post was placed there under permit granted by lawful authority, and no charge of negligence is based upon the erection or maintenance of that post.

Three questions are presented for consideration: 1. Was the railway company negligent? 2. If it was, was its negligence the proximate cause of Honaker's injuries? 3. Was Honaker contributorily negligent? Of these in their order.

1. *Was the railway company negligent?*

The street on which the train ran and the intersecting street were within the limits of a thickly-populated city. At their intersection college grounds abutted upon both streets. The college was in session at that time of the year. The fact that it was customary to ring the bell and blow the whistle as the train approached the intersection is a recognition by the railway company of the necessity of giving such warning. The circumstances justified the finding that the failure to give such warning on the occasion in question was negligence. The violation of the speed ordinance, of course, was negligence per se.

2. *Was the railway company's negligence the proximate cause of Honaker's injuries?*

(1) *Excessive speed.* It is said that, as the train did not run into Honaker but that Honaker ran into the train, the result would have been the same whether the train was going 35 miles an hour or only 15; and, therefore, that the rate of speed had nothing whatever to do with the injuries received by Honaker. With this statement we do not agree. It is true that if a man drives in front of a moving train and it runs over him and cuts off a leg, the speed ordinarily is immaterial, for ordinarily the leg would be severed whether the train is going 35 or 15 or only 5 miles an hour. This is not such a case. It

is true, also, that if the driver of an automobile tries to beat a train to a crossing, is unsuccessful in the attempt, and crashes into the side of one of the cars with such force as to catapult him over the front of the automobile and against the side of one of the cars, thereby crushing his skull, the speed of the train, ordinarily, is unimportant, for the same injury could be sustained if the train were going only 15 miles an hour, or even if it were standing still.

Honaker's automobile, instead of crashing into the car at a high rate of speed, had practically come to a stop. When the side of the car "hooked on" to the automobile it "yanked" the automobile around with such force as to throw Honaker under the train. It was for the jury to determine whether or not that result was due to the excessive speed of the train. We cannot say that, as a matter of law, it was not.

Again, if the train had been going at the lawful speed, Honaker would have had time to cross the track before the train reached the intersection, had he decided to do that instead of turning to the left to go north on Mason street. To this suggestion counsel make the objection that the margin of time was so narrow that a person of ordinary prudence would not attempt to cross in front of the train, and that if Honaker had made the attempt and anything had gone wrong—if, for example, his automobile had ceased to function properly—and a collision had occurred, Honaker would have been guilty of contributory negligence barring a recovery by him. However, in this part of the opinion we are not concerned with the question whether or not there would have been contributory negligence in the hypothetical case, but are concerned only with the effect of the railway company's negligence in the case now before us.

Again, if Honaker was free from blame in getting into the position in which he found himself—a matter discussed in another part of this opinion—the excessive

speed of the train created the emergency that required immediate action on Honaker's part.

■ (2) *Failure to give warning of approach of train.* Counsel say that, as Honaker saw the train approaching, the giving of warning signals would have given him no information that he did not already possess; and, therefore, that the failure to give the customary signals was not the proximate cause of the injuries received by Honaker. In the circumstances, the principle invoked does not apply. If the customary signals had been given, Honaker would have known of the train's approach before he had reached a point 55 to 60 feet from the track, and the jury may well have believed that in that event Honaker would have closed the throttle of the automobile and come to a full stop between 20 and 30 feet from the track, as it was his custom to do when the signals were given.

■ But counsel say that the uncontradicted evidence was to the effect that the signals were given; that the evidence offered to contradict the positive testimony that signals were given was merely negative evidence consisting of testimony that the witnesses did not hear the signals; and it is contended that such evidence is of no weight whatever, and is insufficient to create a conflict in the evidence. Counsel cite two cases to sustain their position. One of them is *Cooper v. Southern Railway Co.*, 153 Va. 93, 149 S. E. 444, where the negative testimony, counsel say, was by witnesses "who were not listening." The other case is *Pere Marquette Ry. Co. v. Anderson* (C. C. A.), 29 Fed. (2d) 479. In that case the court thus states the situation with reference to the witnesses: "They were riding in a Cadillac sedan over a rough and stony road, conversing with each other and two other persons in the sedan, some 300 feet behind the coupe; and the photographs introduced in evidence by both parties show plainly that on account of an embankment between them and the oncoming train, and the condition of the road—being rough and stony at that point—

they were not favorably situated to hear the signals. It further appears that they were not giving attention to whether the signals were given.'' The court quotes with approval the following statement in *Chicago & N. W. Ry. Co. v. Andrews* (C. C. A.), 130 Fed. 65, 70: ''Where the attention of those testifying to a negative was not attracted to the occurrence which they say they did not see or hear, and where their situation was not such that they probably would have observed it, their testimony is not inconsistent with that of credible witnesses who were in a situation favorable for observation, and who testify affirmatively and positively to the occurrence. There is then no conflict.''

We find in our reports the case of *Globe Indemnity Co. v. Stenger*, 82 Colo. 47, 256 Pac. 658. In that case we affirmed a judgment for the defendant. In the opinion we said that, ''The mere fact that O'Brian did not hear the gong is of no avail against the positive evidence that it was rung.'' But that statement was made with reference to the facts appearing in that case. It was not intended to lay down an inflexible rule to be applied in all cases. The cases cited in the opinion show that that was not our purpose. In *Hoffard v. Illinois Central Ry. Co.*, 138 Ia. 543, 110 N. W. 446, one witness was wearing a cap ''well drawn down over his ears to keep them from freezing,'' and the other witnesses were eating breakfast behind closed doors in a house more than a half-mile away. In *Jensen v. Oregon Short Line R. Co.*, 59 Utah 367, 204 Pac. 101, the witness admitted that his attention was centered on a freight train going in the other direction on another track, which train was pulling upgrade and making considerable noise. ''His mind was engrossed with other matters.'' In *McMillan v. Chicago, Milwaukee & St. P. Ry. Co.*, 179 Wis. 323, 191 N. W. 510, the witness (the plaintiff) was in a closed automobile, was somewhat deaf in one ear, and admittedly was thinking of something other than the railroad crossing that he was approaching; and the other witness was in the rear seat of

the same car, engaged "in conversation with his companion." Of the other cases cited in the opinion in the Globe case, supra, it is sufficient to say that the facts justified the holding. In the Jensen case, supra, the court (p. 376) quoted with approval the following statement: "The weight of negative testimony of witnesses as to the giving of signals ordinarily is for the jury to determine; but, when physical conditions and the attending circumstances are such as to render it highly improbable that they could hear, we think the rule should be and is otherwise."

The probative force of negative testimony depends largely upon circumstances. In some circumstances, its probative force may be so slight as to reach the vanishing point; in other circumstances, such testimony may be more persuasive than the positive testimony of some witnesses. It is only when it is so clear that such testimony has no probative value whatever that reasonable men would not differ in their conclusions with reference thereto, that courts are justified in disregarding it on the ground that it does not rise to the dignity of evidence. That is not the situation in the case at bar.

Several of Honaker's witnesses testified on this subject. The witness Potts boarded at the house at the corner of Mason and Laurel streets. He said that he walked across the track and saw the train at College station; that the train whistled at that station, but did not whistle between there and Laurel street. The witness Beach was less than a block away. He said that he had frequently heard the whistle in the evenings; that he did not hear any whistle or horn on the occasion in question; that although he was not listening for anything, he did hear the automobile strike the post. The witness Nuss was at the corner of Mason and Laurel streets. He said that the train generally rang the bell and blew the whistle when it approached the crossing; that he saw the train coming on this occasion, but did not hear any signal; that he saw the accident. On cross-examination, he said that he

could not tell whether he heard the bell ringing or not. The witness Travis was at the corner of Mason and Laurel streets. He said that he saw Honaker and the train approaching; that he heard a whistle down at College station, but that was the only warning he heard; that "It seemed like we heard the bell ringing, but I would not say as to that being absolutely true, because I cannot be positive about it." The witness Kniffin said that he was a block and a half away when he heard a crash and a scream; that he did not hear a whistle; that he was not listening for one; that he heard the bell ringing after the train passed the intersection. Honaker said that the train usually gave warning signals with bell and whistle, and that he usually slowed down and listened; that on this occasion he heard no train signal. On cross-examination, he was asked: "When you slowed up *and* listened first about how far were you west of the railroad track?" He answered: "About 50 or 60 feet." He previously said between 55 and 60 feet.

Of the railway company's witnesses, some said that they heard the whistle; others, that they heard the bell. Miss Buchanan was eating dinner in the dining room of her home at the corner of Mason and Laurel streets. She said that she heard the bell; that she looked and saw Honaker passing; and that she then heard the crash. The witness Means said that he was engaged in digging up a tree 100 feet north of the crossing; that he heard the train whistle two or three times, and the bell ringing continuously before the train reached the crossing. The witness Hamilton said that he heard the train whistle, but at that time it was at College station. The witness Henry said that he heard the whistle. The train then was only about 20 feet south of the crossing. But in the transcript we find the following testimony that does not appear in the abstract: "Q. Now when you heard that train whistling, it wasn't whistling for Laurel street was it? It was whistling for the next street toward town, wasn't it. A. To the best of my knowledge, I would say

it was whistling for Myrtle street rather than for Laurel street. Q. And Myrtle street is the street on down toward town, one block north of Laurel street? A. Yes, sir. Q. And the street after the car had passed the point of this accident? A. Yes, sir.'' Sullivan, the engineer, said that he blew the whistle four times between College station and the Laurel street crossing, and that the bell was rung continuously. The railway company did not call its conductor to the stand.

While it is true that part of the negative testimony possessed but slight probative value, it is obvious that some of the negative testimony was of probative value sufficient to create a conflict with the testimony to the effect that the warning signals were given.

Considering all the circumstances, we cannot say that the jury was not warranted in finding that the railway company's negligence was the proximate cause of Honaker's injuries.

3. *Was Honaker contributorily negligent?*

It is not contended that Honaker was negligent in his efforts to extricate himself from the perilous situation in which he found himself when he saw the train approaching at excessive speed. It certainly cannot be said, as a matter of law, that he was negligent at that time, and by their verdict the jury found that he was not.

It is contended, however, that his being in a position of peril was the result of his own negligence. If so, he was not entitled to judgment.

Counsel contend that Honaker did not have such control of his automobile that he could stop after he had passed the obstruction to his view and before he reached the track, and that, as a matter of law, this constituted contributory negligence. The evidence does not conclusively show that he could not have stopped had he concluded that that was the best thing to do. From the evidence on that subject, different conclusions might be drawn. In cases that required it, we have applied the rule contended for, but in those cases the facts were not

the same as those in the case at bar. Recognizing that negligence cases differ widely in their facts and that it is seldom that the facts in any two cases are the same, we have shown a disinclination, in recent cases, to apply an inflexible standard of due care. Thus, in the recent case of *Sprague v. Herbel*, 90 Colo. 134, 6 P. (2d) 930, we rejected the rule, prevailing in many—perhaps most—jurisdictions, that one who drives an automobile at a speed that will not enable him to stop within the range of his vision is guilty of contributory negligence as a matter of law, and we adopted the contrary rule, announced in *Murphy v. Hawthorne*, 117 Ore. 319, 244 Pac. 79. From the opinion in that case we quoted these words: "Each case must be considered in the light of its own peculiar state of facts and circumstances. After all, the test is: What would an ordinarily prudent person have done under the circumstances as they then appeared to exist?" And we said (p. 139): "Having in view all of these circumstances and others which might be mentioned and that seldom, if ever, two accidents involve identical facts, it seems to us that it would be illogical and unwise to establish the inflexible rule of contributory negligence here contended for." See, also, *Arps v. City & County of Denver*, 82 Colo. 189, 257 Pac. 1094. The facts in the present case bring the case within the reason of the rule announced in the Sprague-Herbel case. A victim of an accident is entitled to have his conduct judged in the light of the surrounding circumstances and conditions; and if it appears, when so judged, to be that of a reasonably prudent person, he cannot be said to be guilty of negligence. *Colorado & Southern Railway Co. v. Ford*, 70 Colo. 408, 201 Pac. 892. One must use care proportioned to the probable danger. Id. p. 412. In *Nichols v. Chicago, Burlington & Quincy Railroad Co.*, 44 Colo. 501, 513, 98 Pac. 808, we said: "A railroad company cannot impute a want of vigilance to one injured by its own negligence if that very want of vigilance is the consequence of an omission of duty on its part, or some

act which prevented the party injured from taking the precautions to prevent injury which he otherwise would.'' And in *Atchison, Topeka & S. F. Ry. Co. v. Page,* 76 Colo. 10, 227 Pac. 840, we recognized the existence of that principle. We said (p. 11): ''If the driver had testified that he trusted to hearing the crossing bell, the engine bell or the whistle, and, not hearing any of them, was misled and so did not look, different questions would have arisen.'' It is not necessary for a driver' specifically to make that statement; it is sufficient if the circumstances are such as to warrant the finding that he did so rely and was misled.

In view of the ''peculiar state of facts and circumstances'' disclosed by the record in the case at bar, it cannot be held, as a matter of law, that Honaker was negligent. The question whether' or not he acted as a reasonably prudent person was properly submitted to the jury.

The judgment is affirmed.

MR. CHIEF JUSTICE ADAMS and MR. JUSTICE CAMPBELL concur.