No. 16,189.

BRICE, DOING BUSINESS AS BRICE OIL COMPANY ET AL.
*v.* MILLER ET AL.

(218 P. [2d] 746)

Decided April 24, 1950. Rehearing denied May 29, 1950.

Messrs. BURRIS & BUMGARDNER, for plaintiffs in error.

Mr. JOHN N. MABRY, Mr. ROBERT A. MORROW, for defendants in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the court.

DEFENDANTS in error were plaintiffs in the trial court and plaintiffs in error were defendants. We will refer to the parties as they there appeared.

At approximately one o'clock in the morning of April 1, 1946, one Hugh W. Bunch, who was the owner of a Packard automobile, was driving in a southerly direction on U. S. Highway 85 at a point approximately seventeen miles north of Walsenburg, Colorado, and Walter E. Miller, Carl J. Ayers, Glenn Raymond Pittman, and Fines Ayers were passengers in his car.

This automobile struck the rear end of a gasoline transport truck owned by defendant Brice and being

driven by defendant MacDonald. The gasoline transport was traveling in the same direction as the car driven by Bunch. Bunch and Fines Ayers, a passenger in the rear seat of the car, died in the accident. LeRoy L. Ayers and Arminta J. Ayers joined as plaintiffs in the action, claiming damages for the wrongful death of their son Fines Ayers. The other plaintiffs were passengers in the car driven by Bunch and sought damages for personal injuries allegedly resulting from the negligence of defendants. Trial was had to a jury resulting in verdicts in favor of each plaintiff for separate sums. Judgments were entered upon the verdicts for sums aggregating $38,254.66.

Upon the trial defendants moved for a directed verdict, which motion was denied. After the jury returned the verdicts defendants moved for judgment notwithstanding the verdicts, which motion was denied. The motion for new trial, which contained a statement of fifty-eight alleged errors, was denied, and defendants have sued out a writ of error specifying thirty-eight points upon which they rely for reversal of the judgments. We need only consider those specifications relating to defendants' motion for a directed verdict, to dispose of this controversy, and accordingly we hereinafter summarize or quote the testimony relating to those specifications.

At all times following the departure of Bunch and his passengers from the city of Pueblo to the point of the accident in question a cross wind was blowing from the west. In the vicinity of the accident the wind had become a gale of near hurricane proportions. The evidence discloses, however, that the said cross wind had not materially affected visibility until near the point on said highway where the accident, forming the basis of this case, occurred. On the westerly side of the highway, beginning at a point approximately 650 feet north of the scene of the accident, and continuing for a distance of approximately one-half mile, there was a wheat field,

to which the witnesses refer either as such or as a plowed field. The high wind blowing across this field created a violent dust storm throughout the entire area, and the highway was so engulfed in swirling dust and dirt that visibility was reduced to a minimum, witnesses testifying that even at those times when the dust was less dense it was impossible to see more than ten or fifteen feet in front of an automobile.

Defendant MacDonald testified that as he approached the dust area he was driving about 25 to 30 miles an hour, and that upon entering the dust storm he reduced his speed to where he could stop within an area of visibility "which was zero; stop at once, in other words." He estimated that he had penetrated the dust area "several hundred feet" when he felt a severe impact, and, believing he had run off the shoulder and straddled a culvert head, he stopped his truck to see what was the matter. He testified emphatically that at the time of the impact his truck was in motion and going at a speed which he estimated to be around five miles an hour.

Plaintiff Walter E. Miller testified that at the time of the collision he was asleep in the back seat and the next thing he remembered was being in a wheel chair in a hospital at Pueblo, Colorado. Plaintiff Carl J. Ayers testified that he also was asleep at the time of the collision and did not regain consciousness until about twelve hours thereafter. Plaintiff Glenn R. Pittman was riding in the back seat and testified concerning the collision as follows: "We suddenly ran into a big duststorm there. We hadn't any more than run into it when the lights of this transport loomed up right in front of us, stopped on the highway. Hugh Bunch slammed on his brakes and swerved to the left, trying to avoid hitting this truck, but we hit it. I got out of the back of this Packard as fast as I could, and went up to the front of the car, between the car and the truck and I met this truck driver with a flashlight in his hand coming toward me, and he told me that his truck was stalled, and

locked in gear, and he said, I didn't have any flares out. And I said, let's get these men out of this car, I said they are bad hurt. And he said two times, he got excited like: 'What can I do? What can I do?' And at that time I saw a car coming from toward Walsenburg, and I said, 'stop that car,' we will get these men in it; and he did, he flagged the car down; and then we took Miller and Bunch out and put them in this car with the soldier boy, he took them to Pueblo to Corwin hospital. And about that time two Denver-Amarillo truck drivers took me in to Corwin in their truck." He stated that the oil transport was only a short distance inside the dust area when the collision occurred, "less than a city block." He estimated the speed of the Packard car in which he was riding to be between 40 and 50 miles per hour after leaving Pueblo. It is apparent that the force of the collision locked the gears of the transport, and the statement attributed to defendant MacDonald, concerning locked gears and absence of flares, related to the condition immediately following the accident. The gasoline transport was equipped with proper rear end lights, all of which were burning at the time of the accident.

The witness Dan Unfug, called by plaintiffs, testified that, as coroner of Huerfano county, he received a call at about 2:15 A.M. April 1, concerning the accident; that he started for the scene at 3:00 o'clock, and the dust storm was still raging. He stated, "I didn't get out of the car at the scene of the accident, due to the density of the storm. * * * There was times you couldn't see beyond the end of the radiator of your car. * * * "Q. Would it even be possible to see a car ahead of you ten or fifteen feet in that storm, with that dirt swishing across your headlights? A. I imagine if you were driving carefully you could. Q. If you were driving forty or fifty miles an hour, could you? A. No, sir. Q. It would be impossible? A. Yes. * * * Q. How fast did you proceed when you got into this dust storm? A.

About ten to fifteen miles an hour. Q. Anything faster than that would have been dangerous would it, in your opinion? A. Very dangerous. * * * Q. How long did you remain out there, would you say? A. About fifteen minutes. Q. Did it pit-mark your car any? A. It certainly did. Q. You were only there fifteen minutes? A. Yes. Q. Did it injure your paint so you had to have it repainted? A. Yes. Q. What did it do to the glass of your car? A. I had to have my glass replaced."

Aldo Felice, a witness for plaintiffs, testified that he was an automobile mechanic, and that at about 2:30 or 3:00 o'clock in the morning of April 1st he arrived at the scene of the collision. He made three trips from Walsenburg to the scene during the progress of the dust storm. He stated that at the time of making these trips, "Visibility was zero; I can't travel over approximately fifteen, twenty miles with the truck." He said that it would be about a block from the scene of the collision toward Pueblo when you would emerge from the dust storm. When he first approached the scene of the accident he could see the dust storm within the range of his headlights.

J. C. Simpson, called by plaintiff, testified that he was a truck driver and reached the scene of the collision at about 2:00 o'clock A.M., coming from Pueblo. He said that the intensity of the storm was not constant; that at times one could see twenty-five feet down the road, and at other times you could see about one hundred feet.

Glenn R. Pittman, one of the plaintiffs, testified: "A. I didn't see the dust until we ran right into it. Q. You didn't see the dust until you ran right into it? A. That's right. Q. What did it look like when you saw it? A. We ran right into it; just a lot of dust. Q. You were in it before you knew it? A. Yes, sir. Q. Were the headlights of the Packard car turned on? A. Certainly. * * * A. We hadn't any more than entered this dust area before we hit the trailer. Q. What do you mean,

by any more than that? A. Less than a city block, to my estimation. * * * Q. Prior to your going right into this dust storm, Mr. Bunch hadn't slackened his speed, had he? A. Not to my knowledge. Q. So that after he got into the dust storm, he was traveling at the same rate of speed he was before he went into the dust storm, isn't that correct? A.' It is possible, yes. Q. As a matter of fact, the only time he did slacken his speed, wasn't it, is when he attempted to stop and avoid hitting that car, or the truck? A. Yes."

Defendant MacDonald stated that the wind was so strong he had difficulty in walking. It could be done, "but you had to mind what you were doing, or it would blow you across the road, blow you across the road into the borrow-pit on the other side." He could see the white stripe in the center of the highway, without stooping, by using his flashlight.

Rex P. Prisbrey, called as a witness by defendants, was driving north from Walsenburg. A truck was following him. His testimony, as abstracted, relating to the visibility was:

"Out of Walsenburg, approximately seventeen or eighteen miles, I ran into another gust of dust, and the dust became so intense I had to,—I had slowed down as I entered the dust, and I had to stop because I couldn't see. The wind was gusty; at times it was denser than at other times. During this period I couldn't see beyond the radiator, and sometimes even out of my windshield. The dust was very intense. I took my handkerchief out of my pocket and' wrapped it around my nose and mouth. It was very dusty inside of the car.

"I stopped for some time, how long I couldn't say. The intensity of the wind seemed to slacken .a little bit so I could see the white line on the highway again, so I proceeded very slowly for a short distance, how far I couldn't say. And evidently my eyes had been off, looking out forward, and as I happened to look up, I saw two headlights. I couldn't tell whether the truck,

what later turned out to be the truck, was stopped or whether it was traveling. I remember I thought of pulling over a little bit to make sure he could pass. In the process I got a little closer, and saw a flash or shadow move across the headlights, the beams. And by this time I had stopped again. A few minutes later my door opened on the left side, and a man said, there has been a bad accident back here; he asked me if I wouldn't give a hand, and I said, yes. So the truck that had been following me, I noticed it almost up against my bumper; he was traveling along practically in back of me all the way. I asked the driver if he would go to the fellows in back of me, explain it to them, and I would go on up to where the truck was. * * * Then I was alongside of the truck, and I was traveling at a very slow speed, barely moving, and in front of me appeared what turned out to be a car. I stopped to ask where the accident was, and this gentleman turned out to be Mr. Pittman. I then went along the side of the truck until I reached the rear end of the truck, and still I couldn't see. My headlights were not shining on anybody, the automobile or anything. He said it was further on back, so I just kept going on up the road; it was a very short distance until my headlights shone on the front of this wrecked automobile."

\* \* \*

"From then on, the only thing I was thinking about, was trying to get the boys into the hospital as quick as we could, because the wind was so terrific and the dust was so thick. I was thinking they might suffocate, then if they were not in bad condition, have something over their face."

\* \* \*

"There were times 'when I couldn't even see the lights of the truck in back of me, when they had the spot light on; they were parked immediately in back.'"

Charles Lee, a truck driver following the Prisbrey car, described the dust storm as follows: "A. Well, I

saw there was this Packard in front of me stopped, and this dust was so bad I couldn't see, I couldn't hardly see the radiator of the truck. Q. And was that a continuous condition all the time,—that is, at the scene of the accident, you couldn't see beyond the end of the radiator? A. Oh, I could see sometimes; see not more than ten feet in front of me. * * * Q. Mr. Lee, after you left the Packard and started north, was the visibility still very bad, or not? A. After we left the accident? Q. Yes; immediately after? A. Yes, sir. Q. How were you able to stay on the mat of the highway? A. Well, we had a spot light, shone it down on the white center line. We couldn't see in front of us. Q. You kept your spot light on the white center line? A. Yes, sir; on the center line. Q. Until you got out of the dust area? Yes, sir." The dust storm extended "approximately, about a hundred yards" to the north of the point of collision.

Murphy Lee, riding in the truck with Charles Lee, testified: "Q. Coming back to the scene of the accident, how was the visibility at that time? A. Well, I would call it zero. I would say you couldn't see. Q. And how much of a wind? A. Pretty strong. Q. How close to the truck, the Brice truck, did you get, before you could see it? A. Well, Charlie stopped, I would say we was possibly ten foot from it; you could see the headlights."

Almon Bates, a livestock trucker, was driving south toward Walsenburg. He stated that the car driven by Bunch passed him four or five miles north of the scene of the accident. It carried a New Mexico license plate, and he estimated the speed of the car at sixty miles per hour as it passed him. He testified further that a north-bound truck driver warned him of the accident, and also stated:

"Well, I drove a half a mile, and all of a sudden my headlights fogged up, just a wall of dirt; it was blowing across the road in front of me, so I immediately hit my brakes. As I entered the wall of dirt I slowed down to

just barely moving, I couldn't see hardly anything. In fact, my headlights wouldn't penetrate the dirt at all. I had a powerful set of fog-lights, amber color, and they would penetrate just a very little bit.

"I knew the wreck was up in front, so I crept along a short distance very slow, and it seemed to me that I could see an object directly in front of me, but I wasn't sure until my bumper pushed against it, what appeared to be an automobile; and so I got out on the side of my truck, that would be the east side, driver's side, east side. I walked forward, and I could see it was this Packard, with the New Mexico license. I recognized the car."

*  *  *

"So I went past everything clear to the back, walking along thru the dirt, I came across this Mr. MacDonald, driver of the oil truck. He was going in the same direction I was; we just run together before we saw each other; he was carrying some kind of a lantern, or flashlight, anyway he had something in his hands. He seemed to be staggering and trying to stand up in the dirt; it was very difficult to walk."

Fred Houdashelt, a witness for defendants, was the courtesy patrolman who covered the accident, arriving at the scene at about 2:00 A.M., accompanied by Officer Hewitt. Among other things, as appears from the abstract of the record, he said: "At the time we got to the accident, into this dirt,—before we got to the accident, I could see this dirt as far as the headlights would pick it up, so I naturally reduced my speed, and came to a stop at the edge of the dirt. * * * He and officer Hewitt got out of the patrol car and the sergeant got under the wheel. They had their flashlights. Mr. MacDonald was standing at the edge of this dirt, at the edge of the intense part of the dust storm, and he had a flashlight, trying to flag traffic down the best he could. 'And we couldn't see with our flashlights when we got down into the dirt, so we went to the patrol car and got out our

fusees.' * * * Q. I believe you said Hewitt was the one that did the directing? A. He did. I held the fusee for him, so he could see thru the dirt; the flashlights were no good, we couldn't see, we could see about five feet probably; that was all you could see, so the flashlight would be no good. Q. And then what happened after this truck went on? A. After this truck went on, we were trying to get traffic thru there after that. I led the traffic thru by walking in front with a fusee in my hand, and they followed me. I got them thru the worst of this dirt." He estimated the distance from the north end of the dust area to the point of collision to be "between five and six hundred feet." Q. If an automobile with lights on at any time in that area, was ahead of you, could you have seen it in your headlights? A. No; not unless you was right up against it. Q. You couldn't have seen the lights of the automobile? A. Not unless you were right up close to it. Q. Could you have seen the lights such as were on the rear end of the Brice truck, a distance of more than ten feet back of the rear end? A. You couldn't."

The accident occurred near a telephone pole numbered 6299. Subsequently, and on a clear day, a measurement was made north from said pole No. 6299 to the north end of the field from which the dust was blown. The distance was six hundred fifty-five feet. Photographs of the oil truck and the car driven by Bunch, taken after the accident, as well as testimony of witnesses, show an impact of great force.

### Questions to be Determined.

■ ■ First: *Was there evidence tending to show negligence on the part of the defendants sufficient to warrant submission of the question of defendants' negligence to the jury?*

The question is answered in the negative. The plaintiffs alleged negligence on the part of defendants in that defendant MacDonald stopped and parked the

transport upon the highway and failed to leave a clear and unobstructed width of at least twenty feet opposite the standing vehicle; that MacDonald failed to "immediately or at all" display a flare at the side of the transport, nor did he place warning flares in the rear thereof, all as required by statute.

The only evidence offered to prove that the oil transport was stopped on the highway was the statement of the plaintiff Glenn R. Pittman, hereinabove quoted. It must be remembered that he was a passenger in the back seat of the car driven by Bunch, and that the visibility was near "zero." The only opportunity for observation of the truck was a fleeting glimpse prior to the impact. Under the circumstances then present it would be impossible for him to know whether the oil truck was standing or moving slowly forward. The bare statement that the truck was "stopped" upon the highway, when considered in the light of all the surrounding circumstances, does not rise to the dignity of evidence sufficient in itself to be the sole basis for liability of the defendants. In his testimony before the coroner's jury on April 8, 1946, he stated: "As we came to where he had this wreck we just seemed to run into a big bunch of dust all at once. We no more than ran into this dust when we hit this truck." Again on May 14, 1948, the deposition of Pittman was taken, and in response to the question asking him to relate what occurred he stated in this connection: " * * * the wind was blowing hard all of this time, but the visibility was clear. We suddenly run into this dust storm, and then hit the back of this truck." Thus upon the two occasions when formal testimony was being given by him, Pittman did not seem to be impressed with the importance of the question of whether the truck was in motion or stopped upon the highway. In the absence of other evidence tending to show that the truck was stopped at the time of the impact, and in view of the positive evidence of the driver of the transport to the effect that

he was moving slowly forward, the testimony of the plaintiff Pittman under all the circumstances is inherently incredible and so opposed to all reasonable probabilities as to fall short of substantial evidence of the fact related. Whenever such a conclusion is the only logical one to be drawn from the admitted physical facts, a statement which is inherently incredible is without evidentiary value. 20 Am. Jur., p. 1033, §1183. *Sanan v. Schoenborn et al.,* 47 Cal. App. (2d) 366, 117 P. (2d) 731. The rule was stated in *Morris v. Carroso et al.,* 292 Ill. App. 620, 11 N.E. (2d) 816, as follows: "While the rule is that there may be such an inherent improbability in the statements of witnesses as to induce the court to disregard their evidence even in the absence of any direct conflicting testimony (*Brown v. Chicago City Ry. Co.,* 155 Ill. App. 434, and cases cited therein), it is also the rule that where the testimony of witnesses is uncontradicted by positive testimony or circumstances and is not inherently improbable, it cannot be rejected."

In the case at bar the inherent improbability goes to the lack of opportunity of the witness to have knowledge of the fact asserted by him, and since it is contradicted by one having positive knowledge, it is insufficient, as a matter of law, to form the basis of defendants' liability. See, also, *McLennon v. Whitney-Steen Co.,* 63 Colo. 568, 167 Pac. 771.

In *Colorado & Southern Ry. Co. v. Honaker,* 92 Colo. 239, 19 P. (2d) 759, we said: "A victim of an accident is entitled to have his conduct judged in the light of the surrounding circumstances and conditions; and if it appears, when so judged, to be that of a reasonably prudent person, he cannot be said to be guilty of negligence. *Colorado & Southern Railway Co. v. Ford,* 70 Colo. 408, 201 Pac. 892. One must use care proportioned to the probable danger."

We are fully persuaded that the defendant MacDonald could not rightfully be charged with negligence under

the test set out in the foregoing quotation, and, under the circumstances with which he was confronted, as shown by the evidence considered in the light most favorable to the plaintiffs, no negligence of said defendant was proved. *Denver-Los Angeles Trucking Co. v. Ward,* 114 Colo. 348, 164 P. (2d) 730.

Second: *As a matter of law was the negligence of the driver of the car in which plaintiffs were riding the sole proximate cause of the injuries and death of which complaint is made?*

■ This question is answered in the affirmative. Assuming, for the purpose of discussion only, that the defendant MacDonald in some manner had not conducted himself as an ordinarily prudent person would have done under the circumstances, there can be no doubt that contributory negligence on the part of the driver Bunch was conclusively shown by plaintiffs' own evidence and all the physical facts disclosed by the evidence. Since Bunch died in the tragic accident, and no survivor of his is a party to this action, we do not impute his negligence to the occupants of the car which he was driving. If, however, the proximate cause of the damage was the negligence of Bunch and the claimed negligence of the defendants was a remote cause thereof, defendants cannot be held liable. As we stated in *Clark v. Wallace,* 51 Colo. 437, 118 Pac. 973: "Whether an act was the proximate cause of damage, is ordinarily a question for the jury, but when the facts are undisputed and are susceptible of but one inference, the question is one of law for the court." In *Snyder v. Colorado Springs & Cripple Creek Dist. Ry. Co.,* 36 Colo. 288, 85 Pac. 686, we held that where there is no dispute in material facts, no jury question is presented. We there stated: " * * * but where, upon all the evidence, the court is able to see that the resulting injury was not proximate but remote, the plaintiff fails to make out his case, and the court should so rule."

■ In *Denver-Los Angeles Trucking Company v.*

*Ward, supra,* the claimed negligence was the failure to place flares or warning signals upon a highway which was blocked by defendant's truck. We said: "Regardless of whether we hold that the failure to place flares or other warnings was a failure to perform a statutory, or a common-law duty, the fact remains that such failure does not constitute actionable negligence unless it is the proximate cause of the injury."

From plaintiffs' own evidence, it appears that the car which collided with the oil transport was traveling "forty to fifty" miles per hour at the time it entered the dust storm area. The dense dust cloud must have been perceptible for a substantial distance within the range of the car's headlights prior to entry into the dust, yet the speed of the car was not lessened. It continued in the area of zero visibility for a considerable distance at the same speed. It was conclusively shown that the car had to travel 656 feet from the north end of the plowed field from which the dust was blown to reach the point of collision. The terrific force of the impact of the car with the truck, as shown by the damage to the machines, the tragic deaths, and the injuries to occupants, is mute evidence, under the attendant circumstances, of the excessive speed of the car as it approached the disaster area.

■ Under the facts shown, it is clear that the sole proximate cause of the accident was the negligence of the driver of the car which struck the oil truck, and that any negligence charged against defendants, even if established, could amount to no more than a remote cause of the accident. *Geisen v. Luce,* 185 Minn. 479, 242 N.W. 8; *Rector v. Allied Van Lines* (La. App.), 198 So. 516.

The judgments are reversed and the cause remanded with directions to dismiss the action.

Mr. Chief Justice Hilliard and Mr. Justice Hays dissent.