No. 22753.

THE INTERMOUNTAIN RURAL ELECTRIC ASSOCIATION, A
CORPORATION *v*. IRVIN E. COONROD.
(476 P.2d 44)

Decided October 13, 1970.     Rehearing denied November 16, 1970.

SHIVERS & BANTA, RICHARD L. BANTA, JR., CECIL R. DITSCH, for plaintiff in error.

GOODBAR & GOODBAR, DWIGHT D. MURPHY, for defendant in error.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

THIS writ of error is directed to a verdict and judgment in favor of Irvin E. Coonrod, plaintiff in the trial court, who sustained personal injuries when he came in contact with an energized electrical wire of Intermountain Rural Electric Corporation. The parties will be referred to either as plaintiff and defendant or by name.

The events which precipitated this controversy occurred after a tornado and flood struck Pine Crest, a residential area south of Palmer Lake, Colorado. Plaintiff alleges that on Thursday, June 17, 1965, the flooded Monument Creek washed out one of the defendant's poles causing the electrical line to be down, where it was in contact with the trunk of a tree located on neighboring property. When the lines were energized and the electricity was restored at about 8:00 p.m. on Friday, June 18, Coonrod observed the wire starting a fire in the trees near the neighbor's house. In attempting to put out the fire he received an electrical shock from the 7,200 volt line.

In his complaint plaintiff contends that his injuries were the direct and proximate result of the negligence of the defendant, the Intermountain Rural Electric Association, in energizing the electrical line in question while it was still down. He alleges that he received permanent injuries from this accident which have made it impossible for him to compete satisfactorily in his trade as a bricklayer. He sought damages against the defendant in the amount of $85,478.

Defendant denied that it was negligent and claimed that the injuries to the plaintiff, if any, were a result of plaintiff's sole negligence or contributory negligence. Defendant also asserted that plaintiff assumed the risk or danger involved.

At the close of the plaintiff's case, defendant moved for dismissal of the complaint and a directed verdict. Again, after all the evidence had been presented, the de-

fendant moved for a directed verdict. Both motions were denied and the cause was submitted to the jury. A verdict was returned by the jury in favor of the plaintiff in the amount of $35,650.

Defendant sets forth several points of argument for reversal. We reject the contention that the court should have directed a verdict against the plaintiff on the ground of contributory negligence as a matter of law and we also hold that the evidence was sufficient to support a verdict in favor of the plaintiff. But the judgment must be reversed and the cause remanded for new trial because the court instructed the jury erroneously in giving Instruction No. 7.

Some elaboration of the facts which led to and culminated in plaintiff's injury is germane to our decision. On Wednesday, June 16, 1965, high winds and a tornado hit the Pine Crest area where Coonrod was living in his summer cabin. Due to the fact that the road leading to Pine Crest was flooded in part and the bridges over the streams were under water, many of the residents were evacuated from the area in 5-ton tandem-drive army trucks, which were able to ford the river. Plaintiff, with his wife and son, decided not to leave with the other residents because, as he testified, his home was on high ground and he did not think the flood water would rise that high.

The electricity and water system failed some time on Wednesday. There was intermittent rain in the area on Wednesday, Thursday and Friday. Plaintiff observed some electrical lines in the neighborhood which were down on Wednesday. He was on his neighbor's property on Thursday to observe the height of the river behind the house. At that time he noticed that the ground there holding an electrical pole was washed away. The pole was leaning at an angle and a line it was carrying was detached from it. On the same day he observed that the bridges leading to the area were under water. On Friday the water had receded considerably, and plaintiff ex-

plored the area. Although the water had receded, he nevertheless observed that the bridge was impassable.

On Friday evening, at about 8:00 p.m., the electricity came on. Approximately five minutes later, his son, who was looking out of the window facing the neighbor's cottage, called to his father that there was a fire. Plaintiff went to the window and saw a very bright fire at the base of a tree on his neighbor's property. He then ran out of his house through the back door, picking up a pail of rain water that was behind the house. He testified that he knew the line was energized and that the fire which he observed from his window was started by the hot line firing the tree. When he came to the tree, he threw a splash of water from the pail on the fire. He immediately felt a charge of electricity through the spray of the splash. He dropped the bucket and started throwing damp sand onto the fire. This seemed to slow the fire but did not extinguish it.

Plaintiff then described his actions as follows: "I stepped back and just *wondered* what to do. I was more or less in desperation." (Emphasis added.)

Plaintiff's wife came to the scene with a pail of water in one hand and an empty plastic bucket with a metal handle in the other hand. Plaintiff took the plastic bucket from his wife and pushed against the electrical line to hold it away from the tree. The bright torch-like kindling caused by the wire arcing against the tree ceased. Due to the fact that the line was either too heavy or too taut, plaintiff could not continue to hold it free from the tree. He therefore decided to step under the line to try to pull the wire with the bucket. He continued to hold the plastic bucket against the wire (it was about 5 feet above the ground) and then attempted to walk under it. As he started to walk under the wire — he testified that he came to within 10 to 12 inches from it — it arced thereby rendering him unconscious. He regained consciousness momentarily, with the line against his hand. This is what caused his injuries. He lost con-

sciousness again, but this time fell free from the line. His wife then dragged him to safety.

When plaintiff again regained consciousness he told his wife to go to one of the neighbor's cabins where there was a telephone and call for help. He meanwhile walked to the cabin of another neighbor to get help to extinguish the fire. There he found two men who returned with him to the scene armed with a rubber hose. Upon arriving they found that the fire had gone out.

The erroneous Instruction No. 7 which implied to the jury that plaintiff was confronted with an emergency situation was as follows:

"A party suddenly confronted with an emergency due to no negligence on his part is not guilty of negligence for an error of judgment when practically instantaneous action is required."

The instruction as given is no longer approved and has been supplanted by Colorado Jury Instruction, Civil 9.7. But it should not have been given because, as defendant points out — and we agree — the evidence detailed above does not reflect that there was an emergency requiring "practically instantaneous action."

The phrase "instantaneous action" has been considered by this court in several decisions. For example, in *Denver & B.P. Rapid-Transit Co. v. Dwyer*, 20 Colo. 132, 36 P. 1106, the court considered the time element in determining that the plaintiff was not contributorily negligent as a matter of law in an accident involving a streetcar which negligently failed to stop at its regular stopping place:

"* * * it is claimed that plaintiff might have saved himself by stepping up on the platform. Perhaps he could have done so but plaintiff had little, if any, time to make a choice. * * *"

*See also Colorado and Southern Railway Co. v. Honaker,* 92 Colo. 239, 19 P.2d 759; *Arps v. City and County of Denver,* 82 Colo. 189, 257 P. 1094; *Montgomery v. Colo. Springs & Interurban Co.,* 50 Colo. 210, 114 P. 659.

▆▆ The following explanation of the emergency doctrine appears in *W. Prosser, The Law of Torts* § 33 at 172 (2nd ed. 1964):

"\* \* \* The emergency doctrine is applied only where the situation which arises is sudden and unexpected, and such as to deprive the actor of reasonable opportunity for deliberation and considered decision. \* \* \*"

▆▆ In *Bogovich v. Chicago M., St. P. & P.R. Co.*, 122 Mont. 312, 203 P.2d 971, the following apt definition is given:

"\* \* \* As relating to the law of negligence, it may properly be defined 'as any event or combination of circumstances which call for immediate action without giving time for the deliberate exercise of judgment or discretion. \* \* \*' "

The facts of the case at bar are not conflicting. The events leading up to the accident and the accident itself are related by plaintiff and his wife who were the only witnesses to it. They reveal deliberate choice of three separate courses of action, and also pause to reflect as plaintiff "wondered what to do next."

▆▆ Although the existence of a fire in a tree some three feet from an absent neighbor's house may require something to be done. in this case there was not such an emergency as to compel hasty or ill-considered action without time for reflection. Therefore, the issue of plaintiff's contributory negligence, if any, should have been submitted to the jury under the "reasonably prudent man" test, *i.e.,* whether under all the circumstances plaintiff did what a reasonably prudent person would have done or whether he failed to do for his own safety that which a reasonably prudent person would have done.

The judgment is reversed and the cause remanded for a new trial.

MR. CHIEF JUSTICE MCWILLIAMS not participating.